**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| JACQUELYN WHOBREY,<br>Plaintiff,<br><br>v.<br><br>TENET HEALTHCARE CORPORATION,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:26-cv-02946-SHL-tmp |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO STAY ACTION AND COMPEL ARBITRATION**

Before the Court is Plaintiff Jacquelyn Whobrey's Motion for Preliminary Injunction, filed July 28, 2026. (ECF No. 2.) Also before the Court is Tenet's Motion to Stay Action and Compel Arbitration, filed August 28, 2026. (ECF No. 14.) Whobrey seeks to enjoin her former employer,[1] Defendant Tenet Healthcare Corporation ("Tenet"), from: (1) enforcing or attempting to enforce the non-compete and non-interference covenants in her employment agreements; and (2) interfering with her pending employment as Associate Chief Nursing Officer with Regional One Health.[2] (ECF No. 2 at PageID 39.) Tenet responded in opposition on August 28, 2026. (ECF No. 17.) A hearing was held on September 8, 2026. (ECF No. 27.) For the reasons stated below, the Court **GRANTS** Whobrey's Motion for Preliminary Injunction and also **GRANTS**

[1] As it turns out, Tenet Healthcare Corporation is an "indirect parent company" over Whobrey's former employer, Tenet HealthSystem Medical, Inc. (ECF No. 21.) For purposes of this Order, "Tenet" refers to the Tenet Healthcare Corporation's subsidiaries, including Tenet HealthSystem Medical, Inc.

[2] Originally, Whobrey also sought to prevent enforcement of the confidentiality and non-solicitation provisions of her employment agreements. At the hearing on the Motion for Preliminary Injunction, that relief was abandoned.

Tenet's Motion to Stay Action and Compel Arbitration

## BACKGROUND

The Court first outlines the factual background related to Whobrey's employment before discussing the evidence and testimony presented at the preliminary injunction hearing.

### I. Factual Background

The underlying facts are not in dispute. Tenet employed Whobrey at Saint Francis Hospital-Bartlett ("Saint Francis Barlett") from May 2020 until June 2026. (ECF No. 1 at PageID 3.) She started out as Saint Francis Bartlett's Chief Nursing Officer ("CNO"). (Id.) As a condition of her employment, Whobrey signed a Confidentiality, Non-Compete, and Non-Interference Agreement ("2020 Agreement"). (Id.; ECF No. 1-3 at PageID 21–22.) The 2020 Agreement provides, in relevant part:

> During your employment and for a period of twelve (12) months after the end of your employment with Tenet, in exchange for the offer of employment or promotion accompanying this agreement and receipt of the confidential information over the course of your employment, you agree that you will not compete, directly or indirectly, with Tenet within a 15-mile radius of any Tenet facility at which you performed services during the 12 months prior to your separation from service.

(ECF No. 1-3 at PageID 21.)

In February 2025, Tenet promoted Whobrey to Chief Nursing Officer/Chief Operating Officer-Saint Francis Bartlett ("CNO/COO"). (ECF No. 1 at PageID 3.) As a condition of this promotion, Whobrey signed a second Confidentiality, Non-Compete, and Non-Solicitation Agreement ("2025 Agreement"). (Id.; ECF No. 1-4 at PageID 29–31.) The 2025 Agreement expanded the noncompete term to "anywhere within a fifty (50) mile radius." (ECF No. 1-4 at PageID 30 ¶ 6.) The 2025 Agreement also added a choice-of-law and forum provision that reads:

> This Agreement shall be interpreted under and governed by, construed and enforced in accordance with, and subject to, the laws of the State of Texas, without giving effect to any principles of conflicts of law. Any disputes between the parties concerning this Agreement shall be settled exclusively in Dallas County, Texas.

(Id. at PageID 31 ¶ 11.)

In April 2026, Tenet "removed" Whobrey from her "dual" CNO/COO position and "returned" her to CNO. (ECF No. 1 at PageID 4.) Tenet did not offer Whobrey a third confidentiality, noncompete, and non-solicitation agreement to sign as a condition of her position change. Instead, Whobrey received a new, single-page offer letter ("2026 Letter"). (ECF No. 1-5 at PageID 36.) The 2026 Letter outlined her compensation and benefits and stated: "Except as discussed herein, you and Tenet agree that all other provisions of your initial offer letter with Tenet HealthSystem Medical, Inc. remain in full force and effect." (Id.)

Whobrey accepted an offer to work for Regional One as Associate Chief Nursing Officer ("ACNO") on June 8, 2026. (ECF No. 1 at PageID 4.) She provided Tenet with her resignation notice that same day, and Tenet terminated Whobrey's employment on June 11, 2026. (Id. at PageID 4–5.)

On June 17, 2026, Tenet sent Whobrey and Regional One a letter concerning Whobrey's "non-compete agreement [that] prohibits [her] from working, directly or indirectly, in competition with Saint Francis Hospital – Bartlett (SFHB) in any position similar to the position(s) [she] held at SFHB within a 50 mile radius of SFHB for a period of 12 months after the termination of [her] employment at SFPB." (ECF No. 1-6 at PageID 37.) The letter further stated that Whobrey's "position at Regional One Health is in direct violation of this Agreement." (Id.) Whobrey has yet to start working for Regional One because she is "uncertain of her legal rights and is placed in reasonable apprehension of liability." (ECF No. 1 at PageID 6.) Regional One has "committed" to hold Whobrey's job offer open until September 14, 2026, "while [she]

attempts to gain clarification of her rights." (Id.)

## II. Preliminary Injunction Hearing

Whobrey sued Tenet here on July 28, 2026, seeking a judgment that declares the restrictive covenants in her 2020 Non-Compete Agreement as the currently applicable one but unenforceable under Tennessee law. (ECF No. 1 at PageID 1.) She filed a Motion for Preliminary Injunction and Expedited Hearing that same day. (ECF No. 2.) Tenet responded in opposition on July 28, 2026, and filed the Declaration of Chris Jenkins in support. (ECF No. 17.) The preliminary injunction hearing was held on September 8, 2026. (ECF No. 27.) Whobrey was the sole witness to testify. Whobrey also submitted the Declaration of Linda Hughlett prior to the hearing.[3] (ECF No. 26-1.) The Court discusses the Declarations before recounting Whobrey's testimony.[4]

### A. Declaration of Chris Jenkins

Jenkins is Saint Francis Hospital-Memphis' current COO but served as Saint Francis Bartlett's COO from November 2018 to December 2024. (ECF No. 17-2 at PageID 123.) His Declaration states that Whobrey participated in leadership, strategic planning, and operational meetings with Saint Francis Bartlett where "confidential and proprietary business information was discussed." (Id. at PageID 124.) These discussions included Saint Francis Bartlett's staffing and service-line strategies, financial performance and forecasts, and its "competitive positioning

---

[3] Whobrey intended to call Hughlett as a witness, but Hughlett was unavailable to appear.

[4] Because the Declarations are not live testimony and only uncontested affidavits, the Court does not give them as much weight as Whobrey's live testimony. However, some weight is due. Cf. Doe #11 v. Lee, 609 F. Supp. 3d 578, 592 (M.D. Tenn. 2022) ("In conducting the preliminary injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on evidence, including affidavits and hearsay materials, which would not be admissible evidence for a permanent injunction if the evidence is appropriate given the character and objectives of the preliminary injunctive proceeding." (citations omitted)).

within the Memphis-area healthcare market." (Id. at PageID 124–25.)

Jenkins also explains that Whobrey's "senior executive" role as CNO/COO included performing patient transfer operations which gave her access to Saint Francis Bartlett's "full network of primary and secondary patient referral sources." (Id. at PageID 125.) Whobrey also participated in daily executive-level calls to review the hospital's transfer center activity. (Id.) These calls "gave her ongoing, detailed knowledge of Saint Francis-Bartlett's referral relationships and transfer patterns, as well as information about the strengths and weaknesses of various decisions related thereto, that is not generally available to Saint Francis-Bartlett personnel outside of its executive leadership." (Id.)

According to Jenkins, Saint Francis Bartlett and Regional One "compete directly" for patient referrals as well the staffing of nurses and clinicians. (Id. at PageID 127.) Because the Memphis-area healthcare market has a shortage of nursing staff, Jenkins states that Whobrey's presence at Regional One "creates a substantial risk that" Saint Francis Bartlett's nursing staff will "follow her to Regional One." (Id.) Further, Saint Francis Bartlett offers a specialized robotic surgery program, and Jenkins "understand[s] Regional One Health is seeking to expand its services in that area." (Id.)

Jenkins notes that, although Regional One holds the "region's Level 1 trauma center designation," Saint Francis Barlett also treats trauma patients. (Id.) He is "concerned that Plaintiff's employment with Regional One Health as ACNO would place her in a position to use, synthesize, and/or disclose the confidential, strategic, and operational information to which she had access as CNO and CNO/COO of Saint Francis-Bartlett to the unfair competitive advantage of Regional One Health and to the detriment of Saint Francis-Bartlett and its affiliates." (Id. at PageID 128.)

### B. Declaration of Linda Hughlett

Hughlett is Regional One's CNO. (ECF No. 26-1 at PageID 164.) If Whobrey were to work at Regional One, she would report directly to Hughlett. (Id.)

Hughlett's Declaration explains that Whobrey was selected for the ACNO position "based on her clinical nursing background, her leadership experience, and her performance in Regional One's interview process. . . . [it] did not select her because of, and did not consider, any relationship she may have with any referral source, physician, facility, or employee of Saint Francis Hospital-Bartlett or any other Tenet-affiliated facility." (Id. at PageID 165–66.) To Hughlett's knowledge, Whobrey has not disclosed any "confidential, proprietary, or non-public information belonging" to Saint Francis Bartlett. (Id. at PageID 166.)

Hughlett's Declaration also explains that the ACNO position is an "internally facing nursing leadership role." (Id.) Meaning, Whobrey's responsibilities would include overseeing "nursing practice standards and clinical quality; nursing staffing, scheduling, and workforce planning; regulatory and accreditation compliance . . . ; nursing education and professional development; patient-experience initiatives; and supervision of designated nursing directors and unit-level nursing leadership." (Id. at PageID 166–67.)

According to Hughlett, Whobrey would not "independently carry" responsibilities related to Region One's business development, marketing, physician relations, or referral development. (Id. at PageID 167.) Nor would Whobrey "independently" administer, supervise, or set policy for Regional One's patient transfers. (Id.) She also states that:

> Nothing about the ACNO role requires knowledge of Saint Francis Hospital-Bartlett's operational plans, financial forecasts, budgets, referral relationships, transfer patterns, service-line strategy, staffing strategy, or competitive positioning. Regional One neither needs nor wants that information, and it would be of no use to Ms. Whobrey in performing the duties described above.

(Id.) Further, "Regional One is prepared to implement reasonable additional safeguards as a condition of Ms. Whobrey's employment," including a written acknowledgment from Whobrey that she will not disclose Tenet-affiliated confidential information, a directive to Regional One staff not to solicit such information from her, and excluding Whobrey from "competitive strategy or referral development discussions for the defined period." (Id. at PageID 168.)

Hughlett's Declaration also explains that Regional One is a "public, safety-net hospital system" and "[i]ts mission and payer mix differ materially from those of a for-profit, suburban acute-care hospital such as Saint Francis Hospital-Bartlett." (Id.) To her knowledge, patient transfers to Regional One for trauma care "are not driven by relationships, marketing, or referral development." (Id.) Transfers are rather driven through "state and regional trauma-system designation, EMOS field-triage protocols, and the clinical needs of the patient." (Id. at PageID 168–69.) "Regional One and Saint Francis Hospital-Bartlett regularly exchange patients in both directions. Regional One accepts transfers from Saint Francis Hospital-Bartlett and transfers patients to Saint Francis Hospital-Bartlett and other area hospitals as capacity and clinical need require." (Id. at PageID 169.) And, as it relates to recruiting nursing personnel, "Regional One does not maintain, and does not need, any list of nurses employed at Saint Francis Hospital-Bartlett." (Id.)

Hughlett finally states that Regional One will withdraw Whobrey's offer if she is unable to begin work by September 14, 2026. (Id. at PageID 170.) Regional One would then restart its search for a new candidate, which Hughlett estimates would take about six to nine months to fill "for a role at this level." (Id.) The ACNO position is "critical" to maintaining Regional One's nursing staff and the "continued vacancy" of this position "creates added administrative strain on [Hughlett] as the Chief of Nursing." (Id.)

### C. Whobrey's Testimony

As noted, Whobrey was the sole witness to testify at the preliminary injunction hearing. Six exhibits were entered into evidence: (1) the 2020 Agreement; (2) the 2025 Agreement; (3) the 2026 Letter; (4) the June 17, 2026, email sent by Tenant to Whobrey and Regional One; (5) an April 22, 2026, email between Whobrey and Tenet employee Stephanie Sankovic, where Sankovic sent Whobrey a copy of the 2025 Agreement; and (6) the Declaration of Linda Hughlett.[5] (See ECF No. 28.) Whobrey testified as follows.

On direct examination, Whobrey testified that she is a registered nurse who received her "compact" license in 2007 and received a master's degree in Healthcare Administration in 2014. She also holds a Nurse Executive Advanced Certification. Whobrey moved to Memphis in June 2020 because her husband, who serves in the Navy, was assigned to a base in Millington, Tennessee. His military orders require that he remain in the Millington area.

Whobrey described her position as CNO at Saint Francis Bartlett as an "external and internal facing executive." She set strategic plans for nurses throughout the organization, managed the budget for labor management, and made sure the hospital had adequate resources and capacity for its patient load. Whobrey clarified that she performed only administrative, not clinical, duties. She acknowledged signing the 2020 Agreement and the 2025 Agreement. Whobrey testified that she did not negotiate the terms, including the non-compete language, in the Agreements and that she was told that she could not accept her initial job offer or 2025 promotion with Saint Francis Bartlett unless she signed them.[6]

---

[5] All exhibits other than the April 22, 2026, email exchange were in the record prior to the hearing as attachments to the filings of the parties.

[6] On cross examination, Whobrey testified that she attempted to negotiate her compensation in the Agreements but no other provisions.

In April 2026, Tenet informed Whobrey that it was "cutting" the dual CNO/COO position. According to Whobrey, Tenet gave her twenty-four hours to sign the 2026 Letter removing her COO position, but leaving her in the CNO position. She asked Tenet what would happen if she did not take the position, and Tenet replied that she would no longer be with the company and "discussed interim steps" for her replacement.

Around this time, Whobrey decided to leave Saint Francis Bartlett and pursue a "unique opportunity" at Regional One as ACNO. This position, as Whobrey testified, is unique because Regional One is a Level 1 trauma center in the Memphis area and the job opportunity would introduce her to "specialties" she had yet to experience, including high risk pregnancies and a burn unit. Whobrey testified that Saint Francis Bartlett is about sixteen miles away from Regional One. Other than Regional One, the closest Level 1 trauma center to Memphis is in Nashville, Tennessee.

Whobrey explained, however, that it is not possible for her to work in Nashville because her husband is stationed in Millington. If barred from working at Regional One, she stated that her "career would be on hold" and her family faces "financial devastation" because her salary accounts for about sixty to seventy percent of her household's income. She explained that, while there are other jobs she could take in the Memphis area, such as teaching or working for a medical device company, because of her lack of experience in those areas, the pay would be less than the position at Regional One.

Whobrey also testified that she did not take any documents or files from Tenet, and possesses none of Tenet's confidential information. She stated that she has no intent to "take" nurses, physicians, or patients to Regional One. She also explained that she only gained "general knowledge" from Saint Francis Bartlett, and is willing to abide by any conditions imposed on her

by the Court to ensure she does not otherwise expose Tenet's confidential information.

On cross examination, Whobrey acknowledged that the Tenet subsidiaries named on her employment agreements differ. The 2020 Agreement was with "Tenet Business Services Corporation" whereas the 2025 Agreement and 2026 Letter was with "Tenet HealthSystem Medical, Inc." Even still, Whobrey testified that she has worked for "Tenet Healthcare" since 2020 and that the different entities named in her employment documents all fall under the larger Tenet corporate umbrella. It is her understanding that the 2026 Letter "referred back" to her 2020 Agreement because the 2020 Agreement was her "initial offer letter." Whobrey stated that the first time she noticed a difference in the Tenet entity paying her was in 2023 when she spoke with Tenet's human resources about a lapsed paycheck. She testified that she had the same job and reporting structure, so she did not see any difference in the various Tenet entities.

Tenet's counsel asked Whobrey whether she had performed services at "Saint Francis Park," which is about ten miles from Regional One. Although Whobrey disagreed that she performed "services" at the Park location, she acknowledged that every other Tuesday she would participate at "round table [meetings] at Saint Francis Park." She also met with "new hires" there for both Saint Francis locations to discuss "safety and patient experience." Whobrey further testified that she had "no oversight or accountability" over Saint Francis Park, and that the facility had its own CNO and COO while she was employed at Saint Francis Bartlett.

Whobrey also testified that if Tenet had offered her a twelve-month severance instead of termination, she would have "accepted it." But on redirect examination, she stated that such a payment would have been "insufficient" and she still would have pursued the opportunity at Regional One.

## LEGAL STANDARD

Familiar legal standards guide here. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[7] Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); see Fed. R. Civ. P. 65. Based on this early-in-litigation posture, preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Camenisch, 451 U.S. at 395).

Courts balance the following four factors when considering whether to grant a preliminary injunction: "(1) the plaintiff's likelihood of success on the merits; (2) the risk of irreparable harm to the plaintiff in the absence of an injunction; (3) the risk that an injunction will harm others; and (4) the broader public interest." PCC Airfoils, LLC v. Daugherty, 176 F.4th 509, 512–13 (6th Cir. 2026) (citations omitted); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (referring to the third factor as the "balance of equities"). Because preliminary injunctions are an "extraordinary equitable remedy," the plaintiff must make a "clear showing" that these factors favor them. EOG Res., Inc. v. Lucky Land Mgmt., LLC, 134 F.4th 868, 874 (6th Cir. 2025) (quoting Starbucks Corp v. McKinney, 602 U.S. 339, 345–46 (2024)).

That said, the first two factors are the most important. Because if the plaintiff is "highly unlikely to succeed on the merits, there is little reason for a court to take the drastic step of enjoining the opposing party at the onset of a suit." Higuchi Int'l Corp. v. Autoliv ASP, Inc., 103 F.4th 400, 404 (6th Cir. 2024) (citation omitted). And if the plaintiff is not facing

[7] In a prior Order, the Court explained why a preliminary injunction here would maintain the status quo. (See ECF No. 25.)

irreparable harm, there is "no need to grant relief now as opposed to at the end of the lawsuit." EOG Res., Inc., 134 F.4th at 886 (emphasis in original) (citation omitted).

## ANALYSIS

Whobrey seeks to enjoin Tenet from interfering with her pending employment at Regional One. Based on the briefing in this case and the testimony and evidence presented at the preliminary injunction hearing, the Court finds that Whobrey has carried her burden of clearly showing that each preliminary injunction factor supports granting her such relief.

### I. Likelihood of Success on the Merits

To demonstrate a strong likelihood of success on the merits here, Whobrey must show that she is likely to succeed on her claim that the noncompete provision in her employment Agreement with Tenet is unenforceable. Such a showing requires her to demonstrate "'more than a mere possibility of success,' but [she] need not 'prove [her] case in full.'" Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 591 (6th Cir. 2012) (citation omitted). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Certified Restoration Dry Cleaning Network, LLC, 511 F.3d at 543 (citation omitted).

Whobrey argues that she is likely to succeed on the merits because the noncompete provisions in the 2020 and 2025 Agreements are unenforceable.[8] (ECF No. 2-1 at PageID 46–48.) That said, Whobrey maintains that the 2020 Agreement is operative and does not bar her employment with Regional One for two reasons. The first is practical—Regional One is outside

[8] Whobrey's Complaint and Motion for Preliminary Injunction focus on the 2020 Agreement. However, in response to Tenet's position regarding which agreement applies, she also contends that the 2025 Agreement is unenforceable.

the 15-mile noncompete radius and the noncompete is therefore inapplicable. The second is based on Tennessee's policy disfavoring covenants not to compete: "A covenant that bars employment with a non-competing, differently-situated provider sweeps far more broadly than any legitimate interest could justify and is unreasonable as applied." (Id. at PageID 48.)

Tenet counters that Whobrey is unlikely to succeed on the merits for two of its own reasons.[9] First, it asserts that the 2025 Agreement applies and, in the event that it does not, "[t]he choice-of-law and operative agreement disputes alone" show Whobrey cannot succeed on the merits because "these are questions the parties have had no opportunity to develop through discovery and thus resolution of those questions is premature." (ECF No. 17 at PageID 108–09.) Second, Tenet has a protectable and reasonable business interest in enforcing the restrictive covenants against Whobrey. (Id. at PageID 110, 113.)

As outlined below, Whobrey is likely to succeed on the merits. The 2020 Agreement governs this dispute, which means that Whobrey's employment with Regional One—which is outside the noncompete radius—is unlikely to violate that Agreement. If that were not enough, the record shows that Tenet has no legitimate business interest in enforcing its restrictive covenant against Whobrey.

**A. The 2020 Agreement Likely Governs**

There is strong evidence that the 2020 Agreement governs this dispute. The 2026 Letter,

[9] At the preliminary injunction hearing, Tenet also argued, for a second time, that injunctive relief is unnecessary here because the parties have an undisputed arbitration agreement in place and the American Arbitration Association's rules provide that an arbitrator can grant emergency and injunctive relief. The Court has already rejected this argument and will not explain its reasoning again. (See ECF No. 25.) See also Performance Unlimited Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1380 (6th Cir. 1995) (holding "that in a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief provided that the party seeking the relief satisfies the four criteria which are prerequisites to the grant of such relief.").

the final employment agreement between the parties, states that the parties "agree that all other provisions of [Whobrey's] initial offer letter with Tenet HealthSystem Medical, Inc. remain in full force and effect." (ECF No. 1-5 (emphasis added).) The question then becomes what "initial offer letter" is being referenced here—Whobrey's first offer to be CNO in 2020 or her second offer to be CNO/COO in 2025. The 2020 Agreement is the only reasonable choice because Whobrey's initial offer letter came in 2020 when she signed her initial employment agreement. And, given that the 2026 Letter was returning Whobrey to her initial position as CNO, it must refer to her first offer in 2020. It makes little sense then to read "initial offer letter" as referring to anything but Tenet's initial employment offer.

Tenet's arguments to the contrary are unavailing. It implied at the preliminary injunction hearing that, because the 2026 Letter was offered by "Tenet HealthSystem Medical, Inc." and the 2025 Agreement was offered by that same entity, Whobrey should have known that "initial offer letter" referred to the 2025 Agreement. Yet this argument runs counter to Whobrey's testimony—the only testimony at the hearing—that she understood her employer to always be "Tenet." And this argument would have the Court accept that Tenet's corporate restructuring somehow nullifies the commonsense understanding that "initial" means "initial." Such strained contract interpretation will not do.[10]

Because the record strongly suggests that the 2020 Agreement is operative, it follows that Whobrey would not violate that Agreement by working for Regional One. The noncompete provision in the 2020 Agreement provides that Whobrey "will not compete, directly or

---

[10] To the extent the 2026 Letter is ambiguous, which it is not, ambiguity alone would not render a preliminary injunction "premature." Tenet had the opportunity to put on proof and brief the issues but has simply failed to overcome Whobrey's commonsense position that "initial offer letter" means "initial offer letter."

indirectly, with Tenet within a 15-mile radius of any Tenet facility at which you performed services during the 12 months prior to your separation from service." (ECF No. 1-3 at PageID 21.) Whobrey testified that Regional One is about sixteen miles away from Saint Francis Bartlett, and Tenet offered no proof to the contrary. So, considering the evidence here, it is unlikely that Whobrey's pending employment with Regional One violates her noncompete agreement.

The only evidence offered that cuts against this conclusion is that Whobrey participated at bi-weekly "round tables" and met with new hires at Saint Francis Park, which is located within the fifteen-mile noncompete radius. But Whobrey also stated that she did not perform "services" at Saint Francis Park during those meetings. The Court agrees. Saint Francis Park had its own CNO and COO throughout Whobrey's employment at Saint Francis Bartlett. There is no proof that Whobrey ever performed a "service" at Saint Francis Park in a CNO or COO capacity.

**B. Tenet Has No Legitimate Business Interest to Enforce Against Whobrey**

Even if the 2020 Agreement were to reach Whobrey's pending employment with Regional One, it is likely that the noncompete provision would be unenforceable under Tennessee law.[11] "In general, covenants not to compete are disfavored in Tennessee." Murfreesboro Med. Clinic, P.A. v. Udom, 166 S.W.3d 674, 678 (Tenn. 2005) (citing Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 472 (Tenn. 1984)). Noncompete provisions "are construed strictly in favor of the employee." Id. That said, Tennessee courts will enforce

[11] Tennessee law applies because the 2020 Agreement contains no choice-of-law provision, and the parties entered and performed under the Agreement in Tennessee. See Am. Home Shield Corp. v. Ozur, No. 16-cv-2400-SHL-tmp, 2016 WL 8738243, at *3 (W.D. Tenn. Sept. 13, 2016) ("[I]f a contract is executed in Tennessee, the law of Tennessee applies unless the parties specifically manifest an intent to be governed by the laws of another jurisdiction.").

noncompete agreements "if there is a legitimate business interest to be protected."[12] Id. A legitimate business interest is found where "special facts [are] present over and above ordinary competition" and the "facts [are] such that without the covenant not to compete the employee would gain an unfair advantage in future competition with the employer." Hasty, 671 S.W.2d at 473 (citations omitted).

As Tenet notes in its briefing, Tennessee courts use a three-factor test for determining whether a protectable business interest exists. (ECF No. 17 at PageID 116.) Those factors are "(1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer." Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999) (citations omitted). None of these factors are met here. While Whobrey may have been privy to arguably confidential information, there is no evidence that it was the type of information that would provide an unfair competitive advantage.

Because Tenet does not allege or argue that it has a protectable business interest in any training that Whobrey may have received, the first factor is not at issue. As for whether Whobrey received confidential information that may lead to unfair competition, Tenet asserts that she possesses such information, but that assertion is not supported by the record. To be sure, Jenkins' Declaration states that Whobrey participated in planning and organizational meetings where "confidential and proprietary business information was discussed." (Id. at PageID 124.)

[12] Tennessee courts also consider whether "the time and territorial limitations are reasonable," id., but that is not in dispute here.

However, the record is too thin to tell what exactly proprietary business information that may be. This is not a situation where customer lists or product information unique to an employer is at issue. And in an industry that does not appear to have confidential information that would provide an unfair competitive advantage, buzz words are not sufficient. There needs to be more of a showing of what needs protecting.

Further, Whobrey testified that she possesses no documents or materials that belong to Tenet. She also testified that any knowledge she took from Tenet was "general" and related to the typical roles of a CNO. The Court finds her testimony credible and concludes that any information Whobrey gleaned from Tenet will not result in unfair competition under Tennessee law. See Combs v. Brick Acquisition Co., No. E2012-02696-COA-R3CV, 2013 WL 5872448, at *3 (Tenn. Ct. App. Oct. 30, 2013) ("An employer does not have a protectable interest in the general knowledge and skill of an employee." (citing Hasty, 671 S.W.2d at 473)). This is especially true considering that beyond using buzz words related to this factor, Tenet has offered nothing concrete to rebut Whobrey's testimony. At bottom, the Court strains to see what type of confidential information Whobrey may possess that could harm Tenet.

As for customer contacts, there is no proof that "customers," whether patients, physicians, or referral networks, associate Whobrey with Tenet and would then simply follow her to Regional One. Tenet argues that Whobrey's position at Regional One may lead to her spoiling its referral network. Yet Whobrey's testimony and Hughlett's Declaration supports the conclusion that Regional One does not rely on a referral list to the same extent Tenet does. Although there is some overlap in referrals, the referral sources are all known. Again, this is not a case where a sales employee seeks to convert her former employer's customers to a competing company. Enforcing noncompete agreements makes sense in that context. But here, Whobrey is

a CNO by trade and enforcing a noncompete against her lacks any justifiable basis as far as this record is concerned.

At bottom, there is no evidence that Regional One and Saint Francis Bartlett compete in any meaningful way. And there is no evidence that Tenet has a legitimate business interest in enforcing the noncompete provisions against Whobrey. Given the record and Tennessee's policy against covenants not to compete, the Court finds that Whobrey is likely to succeed on her claim.

**II. Irreparable Harm**

To suffer irreparable harm in the absence of an injunction, a plaintiff must show a type of harm that cannot be fully compensated by monetary damages. Overstreet v. Lexington-Fayette Urb. Cnty. Gov't, 305 F.3d 566, 578 (6th Cir. 2002) (citation omitted); see EOG Res., Inc., 134 F.4th at 884 ("'Irreparable' means 'not fully compensable by monetary damages.'" (citation omitted)). In the employment context, "[t]he fact that an individual may lose [her] income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay." Overstreet, 305 F.3d at 579 (citations omitted).

However, "an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." Certified Restoration Dry Cleaning Network, LLC, 511 F.3d at 550 (citation omitted). For example, "lost work experience" is difficult to calculate and therefore can lead to an irreparable harm finding. See Johnson v. City of Memphis, 444 F. App'x 856, 860 (6th Cir. 2011) ("Back pay could remedy Plaintiffs' injuries due to lost income alone, but the loss of experience and chances to compete for promotions are not easily valued." (citation omitted). So, too, can the loss of "unique" or fleeting specialized job opportunities lead to irreparable harm. See, e.g., Becton v. Thomas, 48

F. Supp. 2d 747, 763 (1999).

Whobrey argues that she will suffer irreparable harm in the absence of an injunction for a few reasons. First, she would be "barred for twelve months from serving as ACNO of the only Level 1 trauma center in the region—a unique and non-fungible professional opportunity that will not remain available and cannot be recreated by a later damages award." (ECF No. 2-1 at PageID 48.) Second, if Whobrey is barred from continuing her career in Memphis, she has no other place to find employment given her husband's Navy assignment. (Id. at PageID 49.) According to Whobrey, the absence of an injunction risks "loss of a unique position, exclusion from one's professional community, and reputational damages." (Id.)

Tenet asserts that Whobrey's "claims harm here—the potential loss of the Regional One Health opportunity and associated compensation—is precisely the type of purely economic, employment-related harm Overstreet holds is not irreparable." (ECF No. 17 at PageID 108.) Tenet also asserts that Whobrey's loss of employment, if she were to be successful, is compensable through backpay and lost compensation. (Id.)

The record supports Whobrey. On the one hand, it is true that if the Court denied the preliminary injunction, at least part of the harm posed to Whobrey would be purely economic. And it is true that Whobrey is concerned with the economic consequences she would face if the Court barred her from employment at Regional One. Such damage alone would not rise to irreparable harm. But the proof shows that Whobrey's prospective employment with Regional One is unique. Not only does Regional One offer the only Level 1 trauma center in the Memphis area, but it offers Whobrey an opportunity to gain administrative experience in a setting unlike any other hospital in the area can provide. Regional One has specialized areas of patient care that Whobrey testified she has no experience with. This is the exact type of harm that is difficult

to monetize and warrants an irreparable harm finding. What is more, the harm is imminent—Whobrey's opportunity to seize employment is rapidly closing. The Court thus finds that this factor also weighs in favor of granting the preliminary injunction.

**III. Balance of Equities**

The balance-of-equities factor turns "from the harms the plaintiff might suffer to the harms the defendant might suffer, and then ask[s] where the greatest harm would fall." EOG Res., Inc., 134 F.4th at 885–86. So, the focus is on Tenet here.

The Sixth Circuit has long recognized that "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." Certified Restoration Dry Cleaning Network, LLC, 511 F.3d at 550 (citation and internal quotation mark omitted). But that harm only flows when the employer is subjected to unfair competition. And for reasons already discussed in this Order, Whobrey's employment with Regional One poses no risk of unfair competition to Saint Francis Bartlett.

To the extent there is a risk of unfair competition here, the Court directed the parties to propose language that could serve as "guardrails" to prevent any harm to Tenet. The parties submitted their proposal (ECF No. 29), which the Court will partly incorporate in the preliminary injunction's scope. These "guardrails" include specific language barring Whobrey from disclosing any Tenet-related information to Regional One. And on Regional One's end, it is already "prepared to implement reasonable safeguards." (ECF No. 26-1 at PageID 168.) All this is to say that the Court is confident that a narrowly tailored injunction will alleviate any of Tenet's immediate concerns that Whobrey's employment may cause it harm. On balance then, the equities tip in Whobrey's favor.

## IV. Public Interest

The final factor to consider is the broader public interest. Whobrey contends public interest favors her for two reasons: (1) Tennessee public policy disfavors restraints on trade; and (2) "[p]reventing an experienced nurse executive from leading nursing operations at the facility that treats the community's most critically injured patients would harm, not serve, the public." (ECF No. 2-1 at PageID 49.) Tenet does not offer much of a rebuttal: "[w]hile Tennessee law disfavors restraints of trade that are not adequately justified, that policy does not counsel in favor of awarding the extraordinary remedy of injunctive relief invalidating a covenant on an incomplete record; if anything, it counsels resolving the parties' rights through a full and fair process." (ECF No. 17 at PageID 114.)

Because it is likely that Tennessee courts would not enforce the non-compete provision, public policy amply supports allowing Whobrey to serve as ACNO at Memphis' only Level 1 trauma center. Tenet's attempt to create a restraint on trade is unjustified for reasons already discussed; namely, it has no legitimate business interest in preventing Whobrey from working at Regional One. Whobrey has carried her burden at this preliminary stage and a narrowly tailored preliminary injunction will best serve the public interest.

Because all factors support an injunction here, the Court **GRANTS** Plaintiff's Motion for Preliminary Injunction.

## V. Security

Under Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Despite such mandatory language, "the rule in the [Sixth Circuit] has long been that the district court

possesses discretion over whether to require the posting of security." Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co., 714 F.3d 424, 431 (6th Cir. 2013) (citation omitted). Whobrey asks for a "nominal bond" because an injunction does not threaten Tenet with any "compensable loss." (ECF No. 2-1 at PageID 50.) Tenet did not argue to the contrary in its briefing. But at the preliminary injunction hearing, it proposed that Whobrey posts a $100,000 bond.

Whobrey presents the better argument. For starters, Tenet has offered no way to measure any cost or damage it may incur if it has been wrongfully enjoined here. And the preliminary injunction already has sufficient safeguards to mitigate any risk to Tenet's business interests. Whobrey, and Regional One, are on notice of what her employment can and cannot entail. The Court, in its discretion, thus declines to require Whobrey to post even a nominal bond. Given the evidence before the Court, there is simply no reason to conclude otherwise.

## SCOPE OF THE PRELIMINARY INJUNCTION

Having reviewed the record, the Court finds that Whobrey has met her burden of showing that she is entitled to a preliminary injunction. Because each preliminary injunction factor weighs in her favor, Tenet is hereby enjoined from:

1. enforcing or attempting to enforce the restrictive covenants set forth in her Employment Agreements; and

2. taking any action to interfere with, or communicating any threat to Whobrey or Regional One Health concerning, Whobrey's employment as ACNO with Regional One Health.

As mentioned, the parties proposed "guardrails" to include in the preliminary injunction order. Although they agree on the first two terms below, Tenet proposed several additional terms that Whobrey did not agree to. The Court has reviewed all of the terms submitted by the parties and includes the following, with a few minor adjustments:

3. Plaintiff shall maintain as confidential and shall not use or disclose any confidential, propriety, and/or other information not publicly known about Tenet HealthSystem Medical, Inc. (THM) and/or its parents, affiliates, and/or subsidiaries ("Tenet"), including but not limited to information regarding Saint Francis Hospital-Bartlett and/or Saint Francis Hospital-Memphis.

4. Plaintiff shall not solicit, directly or indirectly, any employee, customer, patient, health care provider, and/or physician of Tenet on behalf of Regional One or any other entity.

5. For twelve months following Plaintiff's separation from Tenet, any role Plaintiff may serve at Regional One shall be limited to that of an internally-facing nursing leadership role with core responsibilities involving oversight of nursing practice standards and clinical quality; nursing staffing, scheduling, and workforce planning; regulatory and accreditation compliance (including The Joint Commission and CMS Conditions of Participation); nursing education and professional development; patient experience initiatives; and supervision of designated nursing directors and unit-level nursing leadership. Plaintiff shall not perform any duties for Regional One that are inconsistent with this description.

6. Plaintiff shall not use or disclose to any Regional One representative, or anyone else, information concerning Tenet's: operational and/or strategic priorities; budgets; strategies regarding staffing, recruitment, service-line, pricing, payer-contracting, competitive, referral, and/or business-development; financial planning, performance, and/or forecasts; referral information, including but not limited to referral sources, networks, plans to expand referral sources and/or service areas, and/or relationships with individuals at referral sources; physicians and/or employees; transfer-center operations, transfer patterns, and referral acceptance, rejection, or redirection decisions; robotic surgery program; and/or competitive position in the Memphis-area healthcare market.

7. Plaintiff shall not use or disclose to any Regional One representative, or anyone else, confidential or proprietary information learned during her employment with THM through leadership meetings, strategic-planning meetings, calls and meetings about transfer-center activity, operational meetings, and/or administrator-on-call activities.

8. Plaintiff shall not: identify any Tenet employee to Regional One; suggest or assist in recruiting any Tenet employee; share Tenet's recruitment strategies with Regional One; advise Regional One concerning recruitment strategies beyond those Regional One used prior to Plaintiff's employment with Regional One; discuss Tenet with any employment prospect of Regional One or any other entity; discuss employment opportunities at Regional One or elsewhere with any Tenet employee, regardless of who initiates the communication; provide any Tenet employee with information about job opportunities with Regional One; and/or post available positions on any social-media account through which she is

connected with any Tenet employee.

9. Nothing herein shall prohibit Tenet from: defending against Plaintiff's claims; initiating or participating in arbitration; presenting contract, declaratory, or injunctive claims in a legal setting; seeking clarification, modification, dissolution, or appellate review of this Order; and/or preserving its own claims for damages.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Whobrey's Motion for Preliminary Injunction. Tenet is therefore enjoined according to the Scope of Preliminary Injunction outlined above. The Court also **GRANTS** Tenet's Motion to Stay Action and Compel Arbitration. The parties may move to dissolve the preliminary injunction once an arbitrator rules on the merits or otherwise issues temporary injunctive relief.

**IT IS SO ORDERED,** this 11th day of September, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE